Filed 4/17/13  In re C.D. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re C.D., a Person Coming Under the Juvenile Court Law. | B241284,  B242492 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MICHELLE B., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK75099) |

APPEALS from orders of the Superior Court of the County of Los Angeles. Jacqueline Lewis, Juvenile Court Referee.  Reversed and vacated with directions.

———

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

———

Michelle B. (Mother) appeals from the trial court's orders denying her petitions under Welfare and Institutions Code section 388 and terminating her parental rights as to her son, C.D.[1] We reverse and direct the trial court to grant Mother's petition and return C.D. to her custody.

BACKGROUND

Our opinion in a previous appeal summarized the relevant facts as follows: "Ten-year-old J.H. and his half-brothers R.R., age 5, and C.D., age 11 months, came to the attention of the Department of Children and Family Services (DCFS) in October 2008 after J.H. went to his school nurse to obtain an ice pack for his swollen arm. J.H. told the nurse that his mother's boyfriend had given him a '"whoopin"' the night before. The nurse observed bruises and swelling on J.H.'s arm and called the DCFS.

"That afternoon a social worker interviewed J.H. at school. The worker reported that she observed red, raised linear welts on the child's right arm and back and a dark purple bruise on his upper right arm. She also observed linear scars on J.H.'s legs which, he told her, were the result of '"whoopins"' by the boyfriend with an 'extension cord.' (Later in the interview, he clarified that the cord was a jump rope.) J.H. stated that he received this punishment because he forgot to give C.D. his bottle and then lied about it. J.H. told the worker that before the boyfriend moved into their home, his mother would punish him by hitting him with a belt. Now, however, his mother and her boyfriend usually punish him and his brother, R.R., by hitting them with the jump rope. He said he never saw them hit C.D. J.H. also told the worker that it was not wrong for his mother and the boyfriend to strike him with the rope and that 'he was not scared to go home.'

"Later that day the worker interviewed the boyfriend and five-year-old R.R. at their home. The boyfriend admitted striking J.H. with the jump rope the previous night and showed the rope to the worker. She described it in her report as 'about 6 inches long

[1] All subsequent statutory references are to the Welfare and Institutions Code.

2

with a handle.' She also reported the boyfriend 'appeared bewildered' when she informed him that striking a child hard enough to leave marks and bruises constitutes child abuse. R.R. confirmed that the boyfriend '"whooped [J.H.'s] butt"' the previous day for telling a lie. R.R. told the worker that the boyfriend had also hit him with the jump rope the previous day because he forgot to bring home his homework.

"The worker interviewed Mother at the DCFS office where the children had been taken. According to the DCFS Detention Report, 'Mother denied allegations of physical abuse, although she confirmed that [J.H.] was struck the night before with the plastic jump rope by her boyfriend.' Mother told the worker that in Arkansas, where she was from, physically disciplining a child was not considered 'abuse' and that she had been disciplined with a switch when she was a child. Nevertheless, Mother told the worker that 'if her form of discipline is a problem, she is willing to try other means of discipline for her children.' Mother also stated she did not see any bruising on J.H. that morning and that until the previous night the child had not had a '"whoopin"' in over a month." (*In re J.H.* (Nov. 5, 2009, B213547) [nonpub. opn.].)

"The DCFS filed a petition requesting that the three brothers be declared dependent children of the court under Welfare and Institutions Code section 300, subdivisions (a), (b), (g), and (j). At the detention hearing the court considered the petition, the report summarized above and the arguments of counsel and found a prima facie case for detaining the minors. The court placed C.D. with his father and placed J.H. and R.R. with an extended family member. Mother was allowed only monitored visitation with all three children." (*In re J.H.* (Nov. 5, 2009, B213547) [nonpub. opn.], fn. omitted.)

In subsequent interviews before the jurisdiction and disposition hearing, Mother provided proof that she had voluntarily enrolled and was attending counseling at a Christian counseling center and that she and the boyfriend had voluntarily enrolled and were attending a parenting class through the Long Beach School District. (*In re J.H.* (Nov. 5, 2009, B213547) [nonpub. opn.].) "The boyfriend admitted hitting J.H. with a piece of jump rope. He told the worker he didn't know hitting a child with an object

3

like a rope or a belt was unlawful in California. 'Arkansas is different,' he explained. He admitted that he and Mother 'made a mistake' and stated that if the children are returned home there would be no more physical discipline. He confirmed that he and Mother were participating in a parenting class.

"The DCFS report also summarized reports from the Long Beach Police Department regarding the investigation of the incident that led J.H. to go to the school nurse. The detective assigned to the case reported principally on his interview with the boyfriend. According to the detective, the boyfriend stated he struck J.H. several times with a '"piece of cord"' but that he did not mean to cause J.H. physical injuries; he was just trying to teach him a lesson. 'The boyfriend began crying and stated that he was very sorry for what he did. [He] stated that as a young child, he was disciplined that same way and did not realize that it was wrong to do.' The detective also wrote that the boyfriend said he 'would do anything to get the children back.'

"In testifying at the combined adjudication and disposition hearings, Mother admitted that three or four times in the past year she struck J.H. on his buttocks with a plastic jump rope and a belt but she denied 'caus[ing] injuries to the child.' On direct examination she also testified that as far as she knew the boyfriend did not strike J.H. 'in the head, back, shoulder, arms, leg and hand with a plastic jump rope causing injuries.' On cross-examination she clarified that the boyfriend hit J.H. once with a jump rope but did not cause him injury. Asked whether, if the children were returned to her, she was 'willing to stop using any type of physical discipline on them,' Mother answered, 'Yes.' Mother submitted a letter from her parenting class instructor, dated the day before the disposition hearing, describing that Mother 'is an active participant in my class, she seems eager to learn, and to do anything possible to be a better parent.' Mother also submitted a letter, dated two days before the hearing, from her counseling program stating that Mother 'has recently completed four consecutive sessions and has shown a positive progress.'

"The court adjudicated the three boys dependents of the court under section 300, subdivisions (a), (b), (g) and (j). The court terminated jurisdiction over R.R. and C.D., placed them with their fathers and awarded the fathers sole physical and legal custody of the children with weekly, monitored visitation for Mother. It retained jurisdiction over J.H. and continued his placement with a family member. The court found by clear and convincing evidence that despite the DCFS 'making reasonable efforts to enable the child's safe return home,' '[s]ubstantial danger exists to the physical health of [the minor] . . . and there is no reasonable means to protect [the minor] without removal from parent's or guardian's physical custody.' The court ordered family reunification services and appropriate conjoint counseling for Mother and J.H. It also ordered that Mother complete a DCFS approved program of 'parenting education, preferably a 52-week class, if the Department can identify one.'" (*In re J.H.* (Nov. 5, 2009, B213547) [nonpub. opn.].)

In an opinion filed November 5, 2009, we reversed the dispositional orders removing the children from Mother's home, terminating jurisdiction over R.R. and C.D., and awarding sole physical and legal custody to their fathers. We directed the trial court to return the children to Mother's home "unless circumstances occurring after the dispositional orders warrant other remedies." (*In re J.H.* (Nov. 5, 2009, B213547) [nonpub. opn.].)

On remand, the court reinstated jurisdiction over R.R. and C.D. but did not return them to Mother's home, because on December 25, 2009, Mother and the boyfriend were involved in an altercation at the home of J.H.'s paternal aunt, where J.H. had been placed. Witnesses gave conflicting accounts of the incident, in which Mother and the boyfriend went to the paternal aunt's home (unannounced and without permission, according to the paternal aunt) to see J.H. When the paternal aunt told them that J.H. was playing at a neighbor's house, they headed toward that house but were confronted by the paternal aunt's 37-year-old son, who is a paraplegic and uses a wheelchair but was at that time on parole following a felony conviction for assault with a firearm. According to the paternal aunt, her son told Mother and the boyfriend "to stop harassing

5

his mother and that they needed to leave." The verbal confrontation escalated to a physical one in which, according to at least one witness, Mother spit on and struck the paternal aunt's son, drawing blood. The paternal aunt's son shot Mother's boyfriend, wounding him in the leg.

Mother reported the incident to the police, and the paternal aunt reported it to the DCFS. Upon investigating, the DCFS determined that the paternal aunt's son, a violent felon on parole, was living at the paternal aunt's residence, making it "an illegal placement" for J.H. The DCFS removed J.H. from the paternal aunt's home, placed him in foster care, and sought to modify his disposition order pursuant to section 387.

On February 2, 2010, the DCFS filed a section 342 petition with respect to all three children, contending that the incident with the paternal aunt's son endangered the children's physical and emotional health and safety and placed them at risk of physical and emotional harm and damage.

On November 1, 2010, the trial court sustained the petition. The court placed R.R. in his father's home under supervision of the DCFS, and the court ordered J.H. and C.D. placed in the care of the DCFS, for suitable placement; J.H. was put in foster care, and C.D. was placed with his adult sister. The court also ordered family reunification services and monitored visits for Mother. In a subsequent order, the court terminated jurisdiction as to R.R. and entered a family law order awarding his father sole physical and legal custody. Mother appealed, and we affirmed the removal orders, the denial of unmonitored visitation, and the termination of jurisdiction as to R.R. (*In re J.H.* (Nov. 30, 2011, B228378, B230695) [nonpub. opn.].)

The court-ordered case plan directed Mother to participate in individual counseling and DCFS-approved parenting and anger management programs.[2] It also directed the DCFS to provide referrals to the boyfriend for individual counseling and anger management and parenting programs.

The record reflects that as of March 27, 2010, Mother completed a 52-week parenting program for child abusers. The instructor commented that Mother "has made significant, substantial changes since enrolling in the program" and "has learned to take time-outs and think before reacting."

On February 11, 2011, Mother and the boyfriend completed their DCFS-approved anger management program.

On March 16, 2011, the DCFS filed a section 388 petition requesting authorization to liberalize Mother's visitation to unmonitored or overnight visits for both J.H. and C.D. The petition was based on the changed circumstances that "Mother has consistently participated in individual counseling and anger management." Accordingly, the DCFS reasoned that "[i]f mother's progress continues to be positive, the [DCFS's] recommendation will be for the children to return home at the next court hearing on 5/2/11. Unmonitored and/or overnight visits will facilitate the children's return home. This will also give mother the opportunity to demonstrate that she can appropriately provide for the children." The attached letter from the director of the anger management program stated that Mother "is a very active participant in my class, she participates in the discussions and is learning to deal with her issues regarding her anger. . . . I have great confidence that she is on her way to having control over her past issues." The letter from Mother's individual therapist was similarly supportive.

---

[2]      We note that the record contains no evidence that either Mother or her boyfriend ever struck any of the children in anger. The record also contains no evidence that either Mother or her boyfriend ever suffered from an anger management problem before Mother's child was removed from her custody and placed in a home where a violent felon on parole was residing.

No later than April 5, 2011, Mother was discharged from individual therapy "because she met all treatment goals and was no longer in need of therapy." We note that the record reflects that the therapist was fully apprised of the various versions of the altercation that took place on December 25, 2009. The court repeatedly ordered that all sustained petitions and all DCFS reports be sent to the therapist. In addition, the therapist stated that Mother herself provided the therapist with both a copy of the police report and a copy of the detention report filed by the DCFS on January 5, 2010, and Mother and the therapist "reviewed the information in both reports carefully." The January 5 detention report described in detail the conflicting versions of the altercation.

In a May 2, 2011, interim review report in support of the March 16, 2011, petition under section 388, the DCFS observed that Mother "is continuing to have appropriate, individual, monitored contact with both [J.H. and C.D.]." The DCFS reiterated its recommendation that it be granted discretion to liberalize Mother's visitation to unmonitored or overnight visits for both J.H. and C.D.

On June 7, 2011, both Mother and the boyfriend completed their DCFS-approved parenting program. The social worker reported that Mother stated that "she liked this parenting class better than the previous one, explaining that it provided more tips on how to praise your children for the good behavior as opposed to only reprimanding them for the negative behavior. Mother showed [the social worker] the homework that she completed for the class and [the social worker] observed that [Mother] seems to be learning based on her answers on the homework." Mother also informed the social worker that the boyfriend was not living with Mother, and the social worker "observed no adult male belongings" in Mother's home; but Mother also told the social worker that she planned to live with the boyfriend "someday," because they intended to marry.

On August 1 and 2, 2011, the court conducted a hearing on the section 388 petition that the DCFS had filed on March 16. In support of the DCFS's petition, Mother submitted a letter to the court in which she stated that she "no longer believe[s]" that corporal punishment is a "suitable means of discipline." She also described the alternative methods of discipline and other parenting techniques that she has learned, and

she informed the court that she was now working as a nurse with "special needs children" and that, through her work, she had learned "a great deal of patience." Mother's therapist testified at the hearing and was entirely supportive of the position advocated by DCFS and Mother.

The court granted the petition as to J.H., authorizing unmonitored visits for him, but the court denied the petition as to C.D. The court's minute order states that Mother "is in partial compliance with the case plan." (Mother had in fact completed all court-ordered programs two months earlier.) The court also terminated Mother's reunification services because "we are [past] the 18-month date," and the court set a permanency planning hearing under section 366.26 for both J.H. and C.D. Mother filed a writ petition seeking to overturn the order terminating reunification services, but we denied the petition. (*Michelle B. v. Superior Court* (March 1, 2012, B235454) [nonpub. opn.].)

On November 29, 2011, at the initial section 366.26 hearing, Mother's counsel informed the court that R.R. was now living with Mother, because R.R.'s father, in whose home R.R. had been placed, was in prison, and Mother had obtained custody through the family law courts. The court continued the hearing.

On February 10, 2012, Mother filed a petition under section 388, seeking return of J.H. and C.D. to her care and custody. In support of her petition, she attached, inter alia, documentation showing that she is a licensed vocational nurse, as well as a copy of a performance evaluation from her job, showing that she scored the highest possible rating in all 17 areas that were assessed. The court denied the petition without a hearing as to C.D., but the court granted a hearing on the petition as to J.H.

On March 29, 2012, Mother filed another petition under section 388, seeking return of C.D. to her care and custody (her previous section 388 petition as to J.H. was still pending). The court denied the petition without a hearing. Mother timely appealed.

On May 21, 2012, Mother filed another petition under section 388, seeking return of C.D. to her care and custody (her previous section 388 petition as to J.H. was still

9

pending). On May 29, 2012, the court granted a hearing on the petition. The hearing was originally calendared for June 7 but was later continued to June 25, 2012.

In "last minute information for the court" dated June 22, 2012, the DCFS informed the court that Mother "has complied with all Court ordered programs," including anger management, parenting, and individual counseling. The DCFS again noted that Mother was "discharged from therapy because she met all treatment goals and was no longer in need of therapy." The DCFS further observed that "mother has continued to have unmonitored overnight/weekend visits with her son, [J.H.]," those visits "have been appropriate," "[n]o problems have been reported by mother or [J.H.] with the visits," and J.H.'s foster father "has reported no behavioral problems with [J.H.] upon returning from visits with his mother." The DCFS also inspected Mother's home and found it to be "clean, neat and well kept," raising "[n]o current safety issues or concerns." Accordingly, the DCFS recommended that J.H. be ordered placed in Mother's home. As to C.D., the DCFS felt it was "unable to make" the same recommendation, because C.D. still had not had any unmonitored or overnight visits with Mother (which the DCFS had requested in March 2011). Consequently, the DCFS again recommended that the court grant the DCFS discretion to liberalize Mother's visitation with C.D. to unmonitored or overnight visits.

On June 25, 2012, the court heard and ruled on the section 388 petitions as to both J.H. and C.D. The court granted the petition as to J.H., returning him to Mother's custody under DCFS supervision. The court denied the section 388 petition as to C.D. on the ground that "[t]here [has] been no change of circumstances." The court then proceeded to conduct the section 366.26 hearing as to C.D. The court found that C.D. was adoptable, that there were no legal impediments to adoption, and that no exception to adoption applied. The court terminated Mother's parental rights as to C.D. and ordered adoption as the permanent plan.

Mother timely appealed from the court's order of June 25, 2012. We consolidated that appeal with Mother's appeal from the denial of the section 388 petition she filed in March 2012.

10

DISCUSSION

Mother argues that the trial court abused its discretion by denying the section 388 petition she filed in May 2012. We agree.

"Modification orders in juvenile dependency court are authorized by section 388. Essentially, the statute requires a showing of a change of circumstances and that modification based on that change would be in the 'best interests' of the minor children." (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 526.) "The most sustained reflection on the nature and role of section 388 appears in our Supreme Court's decision in *In re Marilyn H*. [(1993)] 5 Cal.4th 295. Essentially, *Marilyn H.* teaches us that section 388 *really is* an 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights. (See *Marilyn H.*, *supra*, 5 Cal. 4th at p. 309.) As such, section 388 is vital to the *constitutionality* of our dependency scheme as a whole, and the termination statute, section 366.26, in particular. (See 5 Cal. 4th at p. 309.)" (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 528.) We review the trial court's ruling on a section 388 petition for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

The trial court's decision is unjustifiable. The children were removed in October 2008 because Mother and her boyfriend had used corporal punishment on J.H. and R.R. In December 2009, Mother and her boyfriend were involved in some sort of violent altercation with a 37-year-old wheelchair-bound man, who was also a paroled violent felon residing at the home where one of Mother's children had been placed, and who ended up shooting the boyfriend. As to the corporal punishment issue, Mother and her boyfriend explained that they were disciplining J.H. and R.R. in the same way that Mother and her boyfriend had been disciplined as children in Arkansas. When informed that their conduct was unlawful in California, they expressed remorse and pledged that their conduct would not be repeated; the record contains no evidence that they have ever wavered from that commitment. As to the altercation with the paroled violent felon, the record contains no evidence that either Mother or her boyfriend has been involved in any kind of inter-adult violence since then, or that any is likely to occur in the future.

11

Both Mother and her boyfriend voluntarily entered a parenting program before any had been ordered. Thereafter, Mother made consistent progress in all court-ordered programs and actually completed all of them (with flying colors, according to documents in the record) *before* reunification services were terminated. Her boyfriend likewise completed anger management and parenting programs. Mother is now employed as a licensed vocational nurse (she was unemployed for a period of time during the pendency of these proceedings), works with disabled children and adults, and has received a glowing performance evaluation. Her home is "clean, neat and well kept" and raises "[n]o current safety issues or concerns." R.R. has been living with Mother at least since November 2011, without incident. J.H. had unmonitored visits with Mother beginning in August 2011, also without incident, and has now been returned to her custody. The DCFS itself was recommending unmonitored or overnight visits for C.D. five months before reunification services were terminated, with the stated aim of returning C.D. to Mother's custody in May 2011. But to this day Mother has not been given the opportunity for a single unmonitored visit with C.D., and now her parental rights have been terminated.

The existence of changed circumstances is not open to serious dispute—the trial court itself found changed circumstances as to J.H. Between November 2010, when the trial court entered its disposition order as to C.D. (which has remained unchanged), and June 2012 (when the trial court denied Mother's last petition under section 388), at least the following changes had taken place: Mother timely completed all court-ordered programs; her boyfriend timely completed parenting and anger management programs as well; Mother secured employment and received an excellent performance evaluation; Mother's home was inspected and approved by the DCFS; R.R. was returned to Mother's custody and lived there for at least six months without incident; and J.H. received unmonitored visits with Mother for nine months without incident.

The remaining issue is C.D.'s best interests. The trial court apparently concluded that returning C.D. to Mother's custody would not be in C.D.'s best interests because of a risk of abusive corporal punishment. The record contains no evidence to support that

12

conclusion.  In addition to completing all court-ordered programs, Mother has repeatedly renounced the use of corporal punishment, both in writing and in sworn testimony before the court.  Her boyfriend has likewise stated that he will not use corporal punishment.  R.R. has been living with Mother at least since November 2011, and J.H. has had unmonitored visits with her since August 2011.  There is no evidence that any corporal punishment has been used during that time.  In sum, there is no evidence that returning C.D. to Mother's custody (particularly under DCFS supervision) would not be in C.D.'s best interests.

For all of the foregoing reasons, we conclude that the trial court abused its discretion by denying Mother's section 388 petition seeking the return of C.D. to her custody.  We sympathize, however, with the DCFS's concern that an abrupt return might be difficult for C.D. because he has had no unmonitored or overnight visits with Mother since he was removed in October 2008.  We therefore direct the trial court on remand to authorize the DCFS to arrange a brief transitional period of unmonitored and overnight visits for C.D. in preparation for his return to Mother's custody at the earliest possible date.[3]

---

[3]     We note that when the DCFS first requested authorization to allow unmonitored and overnight visits for C.D. on March 16, 2011, the DCFS anticipated that C.D. would be returned to Mother's custody just one and one-half months later, on May 2.

13

DISPOSITION

The June 25, 2012, order denying Mother's section 388 petition as to C.D. is reversed, the order terminating her parental rights as to C.D. vacated, and the trial court is directed to enter a new and different order granting Mother's petition and returning C.D. to her custody under DCFS supervision following, if necessary, a brief transitional period of unmonitored and overnight visits.  If the parties file a stipulation to immediate issuance of the remittitur, then the clerk shall issue the remittitur forthwith.  (Cal. Rules of Court, rule 8.272(c)(1).)

NOT TO BE PUBLISHED.


                                        ROTHSCHILD, Acting P. J.
We concur:


        CHANEY, J.                JOHNSON, J.

14